UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ANDREA COVINGTON DENMON                                    PLAINTIFF

          VS.                    Civil No. 2:14-cv-02091-MEF

CAROLYN W. COLVIN,                                         DEFENDANT
Commissioner of Social Security Administration

## MEMORANDUM OPINION

Plaintiff, Andrea Covington Denmon, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §423(d)(1)(A), 1382c(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. §405(g).

## I.      Procedural Background:

Plaintiff filed her application for DIB and SSI on October 21, 2011, alleging an onset date of April 11, 2011, due to broken ribs, right heel with ankle injury, right wrist injury with limited movement ability, hypertension, and depression. (T. 156) Plaintiff's application was denied initially and on reconsideration. (T. 71-73, 74-77, 82-83, 84-86). Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Elaiser Chaparro, on April 24, 2013. Plaintiff was present and represented by counsel.

At the time of the hearing, Plaintiff was 42 years of age, graduated from high school, and held a license as a nurse practitioner ("LPN"), and registered nurse ("RN").  Her past relevant work

experience included working as a LPN from July 1998 to June 1999 and June 2000 to September 2006, and a RN from December 2006 until April 11, 2011. (T. 157, 287)

On July 16, 2013, the ALJ found Plaintiff's status post right heel, right wrist and rib fractures, status post subtabular fusion of right foot, and anxiety disorder, not otherwise specified, severe. (T. 26) Considering the Plaintiff's age, education, work experience and the residual functional capacity (RFC") based upon all of her impairments, the ALJ concluded Plaintiff was disabled from April 11, 2011 through April 24, 2013. The ALJ determined Plaintiff had the RFC for less than a full range of sedentary work.  She was limited to lifting and carrying no more than ten pounds; unable to stand or sit for more than thirty minutes at a time, but could otherwise stand for a total of two hours and sit for a total of three hours in an 8-hour day; she could not bend, crouch, or climb at all; she should perform no frequent grasping or handling with her right upper extremity; secondary to pain and effects of medications, she could not maintain attention and concentration or meet normal attendance, punctuality, and production requirements; and she had to elevate her legs during the workday. (T. 27) The ALJ determined on April 25, 2013, Plaintiff's severe impairments medically improved and she was no longer disabled. (T. 32) Based upon her medical improvement, the ALJ determined Plaintiff had the RFC to perform a full range of sedentary work. Plaintiff could not lift or carry more than ten pounds; she was able to sit most of the time, six to eight hours, per day; stand or walk up to two hours in an 8-hour work day; and, she could not frequently bend, crouch, or climb, perform frequently operation of levers with her right upper extremity. Otherwise she could perform complex, detailed, or skilled tasks, involving multiple variables; and she was able to exercise considerable independent judgment and required little or no supervision. (T. 32-33)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on March 14, 2014. (T. 1-5) Plaintiff then filed this action on April 14, 2014. (Doc. 1) This case is before the undersigned pursuant to consent of the parties. (Doc. 5) Both parties have filed briefs, and the case is ready for decision. (Doc. 11 and 12)

## II.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox, v. Astrue,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003).   The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel,* 221 F.3d at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A),

1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that she is unable to perform either her past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the plaintiff has engaged in substantial gainful activity since filing his or her claim; (2) whether the plaintiff has a severe physical and/or mental impairment of combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the plaintiff is able to perform other work in the national economy given his or her age, education and experience. 20 C.F.R. §404.1520(a)-(f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.    Evidence Presented:

The medical evidence is as follows.

On April 11, 2011, Plaintiff was transported via ambulance to Medical Park Hospital "(Medical Park") due to a motor vehicle accident, where she was hit head on by another driver who was texting and driving.  Plaintiff's car rolled over and she was cut out of her vehicle. (T. 46) Plaintiff

had severe pain in her lower back, right ankle, and foot. (T. 262) The X-rays showed an impacted comminuted fracture of the right calcaneus, an achilles insertional calcaneal spur, soft tissue swelling of the right ankle, but no other fracture or subluxation, and some tilt to the right lumbar spine, which might have been positional or related to a muscle spasm. (T. 264) As a result of the accident, Plaintiff suffered a right ankle fracture, four crushed ribs, punctured lung, spontaneous pneumothorax, pelvic injuries, and a right wrist fracture. (T. 46-47)

Plaintiff saw Dr. Kevin McCleod, orthopedic surgeon, on April 13, 2011, for the injuries sustained from the motor vehicle accident.  Dr. McCleod observed Plaintiff had a swollen wrist, the sensation was intact, and there was no loss of function.  The notes indicated moderate carpal tunnel and no fracture.  Regarding Plaintiff's right heel, he observed dorsal swelling of her foot, her right heal was splinted, and a Jones support. (T. 294)

Plaintiff went back to Medical Park on April 18, 2011, with complaints of rib pain on the right side, fever, and trouble taking deep breaths. (T. 254) The X-ray of the right ribs and chest showed a bilateral basilar interstitial infiltrate consistent with compressive atelectasis associated with restricted diaphragmatic movement.  There was an anterior rib fracture of the right 9th rib. (T. 258) On April 21, 2011, a CT of Plaintiff's right lower extremity showed a burst calcaneal fracture with extension into the talocalcaneal joint. (T. 293)

Plaintiff saw Dr. McCleod on April 25, 2011, where he rewrapped her right ankle and informed her to not put any weight on her right ankle.  Regarding her wrist, the notes indicated she was in no major pain, her wrist sprain improved, and to wear orthosis. (T. 292) On May 6, 2011, Plaintiff followed up with Dr. McCleod regarding her right heel.  At this visit Dr. McCleod moved Plaintiff to an orthoboot and ordered her not put any weight on the right heel for two weeks.

Plaintiff saw Dr. McCleod on May 27, 2011, and her range of movement on her right heel had improved, her wrist was still tender, however the range of movement was not equal to the left. (T. 289) Dr. McCleod ordered an MRI of the right wrist and to continue with physical therapy. (T. 289) On June 2, 2011, a MRI of the right wrist showed a nondisplaced marcofracture across the waist of the scaphoid bone and surrounding inflammatory changes to the joint fluid and tendonitis. (T. 250-251) A CT of Plaintiff's lower extremity showed burst calcaneal fracture with extension into the talocalcaneal joint. (T. 252) After Plaintiff's MRI, on June 6, 2011, Dr. McCleod noted Plaintiff's right wrist was restricted, tender, she continued to wear orthosis, and attended physical therapy. (T. 288)

On June 10, 2011, Plaintiff attended physical therapy at Hope Physical Therapy Center, where her range of motion on the right ankle abduction/adduction was decreased by 60 percent, dorsiflexion was –9 degrees to neutral on the right, plantar flexion lacked 28 degrees being equal to the left, angle circles were poor at only 50 percent of normal, and her toe flexion and extension had decreased by 30 percent. (T. 269) The physical therapist observed Plaintiff wore TED stockings and had a lot of swelling. (T. 269)

On June 20, 2011, Plaintiff's range of motion increased, however she needed to progress more. (T. 270) Plaintiff also had a follow-up with Dr. McCleod on the same day.  Plaintiff had mild range of movement with her right wrist, wore a walker boot for her right heel; she continued physical therapy and wore orthosis. (T. 285)

Plaintiff's examination with Dr. McCleod on July 18, 2011, showed Plaintiff improved with physical therapy, however it was really slow. (T. 284) Plaintiff was limited in her range of movement regarding her hand, her right heel was intact, but Plaintiff had to stay active. (T. 284)

Plaintiff continued with physical therapy from August 1, 2011 to September 30, 2011. Throughout her therapy Plaintiff continued to complain of pain and swelling.  Plaintiff progressed from a wheelchair, to a rolling walker, and finally a quad cane. (T. 277, 279) On September 30, 2011, Plaintiff's last physical therapy session, she still complained of mild pain in her right ankle and mild stiffness in her right wrist.  She had made good progress and gained strength. Plaintiff's right wrist flex was 63 degrees, extension 75 degrees, ulnar deviation 25 degrees, and radial deviation 20 degrees**.**  Plaintiff's right ankle range of movement was 28 degrees for plantar flexion and 19 degrees of dorsiflexion, 20 degrees inversion, and 18 degrees eversion.  Plaintiff's gait had improved, she ambulated with a quad cane, and had a mild limp. (T. 279)

On October 14, 2011, Plaintiff had her final impairment visit with Dr. McCleod.  On this visit Dr. McCleod utilized the American Medical Association, G*uides to the Evaluation of Permanent Impairment,* (4th ed. 1993) ("*Guides*") to aid in the determination of Plaintiff's maximum medical improvement of her ankle and right wrist. Permanent impairment is defined as "one that has become static or stabilized during a period of time sufficient to allow optimal tissue repair, and one that is unlikely to change in spite of further medical surgical therapy." *Id.* at 1/1. In utilizing the *Guides*, Dr. McCleod determined Plaintiff sustained a loss 12% of her whole person with regard to her ankle and a 12% loss of whole person with regard to her right wrist, which equates to a 24% loss of whole body. Plaintiff's ankle flexion was 35 degrees, extension 10 degrees, inversion 15 degrees, and eversion 20 degrees. (T. 282, 283)

On March 3, 2012, Plaintiff went to the Mena Regional Heath System, because she had tripped and twisted her ankle, which caused pain and swelling. (T. 326) Plaintiff's blood pressure was 188/109.  At the time of examination, Plaintiff was taking Atenolol, Flexeril, Lortab, Prozac, Vitamin D, and Calcium. (T. 441) Plaintiff's physical assessment showed she ambulated with a

cane, her sock and TED hose were removed and her leg was elevated. There was tenderness, swelling, and limited range of movement of the ankle. (T. 329) The X-ray showed the bones were osteopenia and there was no acute fracture or dislocation. (T. 338) The clinical impression was an ankle sprain. (T. 337) Upon discharge, Plaintiff was prescribed Lortab, Atenolol, Flexeril and Prozac; she put her on Ted hose, ankle brace and ambulated with a cane. (T. 330, 335, 340)

On March 6, 2012, Plaintiff had an appointment with Dr. Robert Williams, at the Williams Medical Clinic, for her right ankle pain and a referral to an orthopedic surgeon.  Dr. Williams diagnosed Plaintiff with hypertension, post-traumatic stress disorder, anxiety and depression, and post-menopausal; he prescribed Zoloft, Atenolol, and Zyrtec. (T. 477)

Plaintiff established care with Dr. Robert J. Olive, orthopedic surgeon, due to pain in and around the right ankle on April 16, 2012. (T. 346) Plaintiff was given a cortisone injection after the last visit, and indicated it had helped a great deal and there was less pain in walking, stair climbing and going up inclines. (T. 346) Upon examination, the ankle showed bilateral pes planus deformities and pain to range of motion of the ankle and subtalar joint.  There was also severe pain to range of motion, varus/valgus stressing, and plantar flexion and inversion, and pain to palpation along the medial and lateral joint line and sinus tarsi areas. (T. 346) Dr. Oliver assessed Plaintiff with moderately advanced arthritis of the right subtalar joint. Prior to leaving, Plaintiff received a cortisone injection. (T. 346)

At the request of Dr. Williams, Plaintiff had a bone scan performed at Mena Medical Center on April 24, 2012. (T. 423) The scan showed findings consistent with osteopenia and a T-score above the fracture threshold.  There was no significant risk for compression fracture at that time. (T. 424)

On May 5, 2012, Plaintiff received a cortisone injection for her ankle pain. Upon examination, Plaintiff's ankle showed bilateral pes planus deformities, pain to range of motion, severe pain to range of motion, varus/valgus stressing, and plantar flexion and inversion; she had pain to palpation along the medial and lateral joint line and sinus tarsi areas. (T. 469)

Plaintiff sought treatment from Dr. Olive on May 7, 2012. Plaintiff complained of pain that worsened with weight bearing and walking on uneven surfaces, she was unable to ambulate without a cane and had not been back to work as an RN since the accident, due to her limitations. Plaintiff had not tried orthotics, but showed no improvement with the use of over the counter NSAIS's or subtalar corticosteroid injections. (T. 466) Upon examination, Plaintiff's right foot was quite swollen, she was over the posterior aspect of the lateral malleolus and down the inferior tip to the plantar aspect of the foot around the cuboid. There was decreased dorsiflexion, inversion and eversion, plantar flexion appeared normal, resisted eversion caused significant discomfort and the anterior drawer was stable. In reviewing the old radiographic findings, they showed severe degenerative changes in the subtalar joint, consistent with the previous calcaneal fracture. The foot appeared very osteopenic. (T. 468) Plaintiff's options included: do nothing, wear orthotics, and subtalar fusion. Plaintiff chose the subtalar fusion. (T. 468)

On May 22, 2012, Plaintiff was admitted to Mercy Hospital Hot Springs, Arkansas by Dr. Olive for a fusion of the right subtalar joint. Plaintiff complained of pain in and around the area of the right foot. Furthermore, Plaintiff indicated it hurt anytime she stepped on uneven ground, which caused severe pain in the subtalar joint area. Plaintiff had tried, on several occasions, nonsteroidal anti-inflammatory medication, which no longer benefited her. Upon physical examination, Dr. Olive observed the right foot revealed pain to range of motion of the hindfoot, severe pain to inversion and eversion of the heel, which caused some slight crepitation. There was

no pain to dorsiflexion or plantar flexion of the ankle.  The imaging showed arthritic changes to the subtalar joint of the foot along with significant osteopenia. (T. 356) Dr. Olive's assessment was post-traumatic right subtalar arthritis unresponsive to conservative care and performed a fusion of the right subtalar joint. (T. 357) One day post operation, Plaintiff complained of pain in the right foot, however it was controlled by pain medication. (T. 357) Plaintiff continued to complain of pain throughout her stay at the hospital. (T. 383, 384, 390, 391, 395-398, 402, 403-405) Plaintiff was discharged on May 23, 2012 with strict instructions to not bear weight on the right foot, wear a CAM walker boot, and use crutches or walker for ambulatory assistance. (T. 457) Plaintiff was prescribed Tenormin, Zantac, Zyrtex, Flexeril, Calcium Carbonate, Cholecalciferol, Vitamin D3, Colace, Hydrochlorothiazide, Zoloft, Coumadin, Hydrocodone-Acetaminophen, and Mevacor. (T. 458-459)

On May 6, 2012, Plaintiff had a follow-up examination with Dr. Olive, following her subtalar fusion of the right ankle.  Plaintiff indicated she was doing much better, but there was still postoperative pain.  Dr. Olive indicated it was a satisfactory follow-up and for the Plaintiff to continue toe touch weight bearing only and to keep the foot elevated. (T. 456)

Plaintiff saw Dr. Rodd Hardon, orthopedic surgeon at MMC Healthfirst Orthopedics, on June 27, 2012, due to her arthritis in her right foot and osteoarthritis of the subtalar joint.  At the time of the office visit Plaintiff was taking the following medications: Hydrocodone-Acetaminophen, Colace, Calcium Carbonate, Cholecalciferol, Vitamin D3, Hydrochlorothiazide, Zoloft, Mevacor, Flexeril, Tenormin, Zantac and Zyrtec. (T. 453) He discussed the results of the bone density scan, osteoporosis, prognosis and options for additional workup. (T. 454)

On July 6, 2012, Plaintiff had a six week follow-up with Dr. Olive's physician assistant, Jarrett W. Stark ("PA Stark"), where she complained of moderate pain and quite a bit of swelling in her

10

right foot and ankle.  She continued to wear TED compression hose, but when she took them off the swelling returned.  At the time of the examination, Plaintiff was not full weight bearing, she wore a walking boot and ambulated with crutches. Plaintiff also complained of some numbness in her lateral foot around the incision and in her fourth and fifth toes (T. 452) Upon physical examination, the incision was well healed, there was quite a bit of swelling, she was minimally tender to palpation, and she had good range of movement to the ankle with dorsiflexion and plantar flexion. In the physician assistant's opinion the numbness was likely secondary to incision over the lateral foot and would continue to improve.  She was to continue to wear the walking boot, only apply toe-touch weight bearing with crutches or walker with assistance, and elevation and compression, as needed for swelling. (T. 452)

On August 1, 2012, Plaintiff had a diagnostic evaluation at Western Arkansas Counseling and Guidance Center "(WACG") with Ginny Reding, licensed associate counselor. (T. 509) Plaintiff last worked at Medical Park/Howard Memorial as a charge nurse.  She reported few problems with her last job, however since the accident she had major problems with her finances, as she only received money from the transitional employment assistance program, TEA, and EBT Food stamps. (T. 510) During the evaluation Plaintiff's motor behavior, speech quantity and quality were normal, she had an overall severe level of distress, and showed signs of anger.  Plaintiff's mood was angry and anxious, while her affect was appropriate. (T. 511) Ms. Reding observed Plaintiff's anxiety disorder, not otherwise specified, (rule out PTSD) was experienced by a traumatic event, a severe car accident in April 2011, and an avoidance of a similar situation, a reluctance and avoidance to drive at night; difficulty falling or staying asleep; and, irritability and difficulty concentrating. (T. 511) The treatment plan included anger management, where Plaintiff internalized a great deal of anger and anxiety related to her ex-husband and car accident (T. 512)

11

Plaintiff was to learn and implement more healthy ways to deal with her anger, work through past trauma, and reduce related anxiety. (T. 513)

On August 8, 2012, Plaintiff had a twelve week follow-up with Dr. Olive, where she complained of moderate pain and quite a bit of swelling in her right foot and ankle. She continued to wear TED compression hose, but when she took them off the swelling returned. At the time of the examination, Plaintiff was not full weight bearing, she wore a walking boot and ambulated with crutches. (T. 451) Upon physical examination, Dr. Olive observed the incision healed, however there was quite a bit of swelling, she was tender to palpation, good range of movement dorsiflexion and plantar flexion, however there was no subtalar motion. (T. 451) Dr. Olive stated it was a satisfactory follow-up to subtalar fusion of the right foot, she was to progress to weight bearing, as tolerated. (T. 451)

Plaintiff met with Dr. Kevin Price, staff Psychiatrist at WACG, on August 27, 2012, due to stress, anxiety, anger management, and adjustment issues. (T. 501) Plaintiff had panic attacks at night and slept poorly. While Plaintiff could not function on Zoloft, she did fairly well on Prozac. (T. 501) Plaintiff's past medical history included ankle fusion, osteoporosis, GERD, hypertension, and seasonal allergies. (T. 501) Plaintiff lived in Mena with her two younger children, got a divorce in 2012, after 19 years of marriage, denied drug and alcohol problems, and applied for disability. Plaintiff was cooperative in the interview; her speech rate and volume were normal, thought process was goal directed and clear, and her affect and mood were appropriate. (T. 501) Plaintiff was diagnosed with anxiety disorder, not otherwise specified; economic, occupational, other psychosocial and environmental and primary support group problems; and, a GAF score of 55. (T. 501-502) Plaintiff was taking Atenolol, Hydrochlorothiazide, Lovastatin, Vitamin D, Calcium Folate, Zyrtec, Zantac, Voltaren, Flexeril, and Lortab; and prescribed Prozac. (T. 502)

On September 18, 2012, Plaintiff followed up with PA Stark, after her subtalar fusion of her right ankle. (T. 450) Plaintiff complained of intermittent popping, as well as moderate swelling in the foot.  She had been wearing TED compression hose, but when removed the swelling returned. Plaintiff was in normal shoes and weight bearing, as tolerated. Plaintiff experienced numbness in the medial midfoot, which was present prior to surgery, but worsened. (T. 450) Upon physical examination, Plaintiff had decreased sensation in her medial arch, right foot. (T. 450) X-rays showed appropriate position of the hardware.  Plaintiff was assessed with a satisfactory follow-up to subtalar fusion of the right foot with moderate degenerative joint disease, right ankle.  Plaintiff's plan included the use of TED compression hose for swelling, weight bearing as tolerated, recommended orthotics and discussed changes due to hindfoot fusion. (T. 450)

Plaintiff saw Dr. Williams on September 18, 2012, for neuropathy in her right foot. He diagnosed her with hypertension, GERD, post-menopausal, PTSD, osteoporosis, hypercholesterolemia. She was prescribed Prozac, Voltaren, Zantac, Lisinopril, and Lovastatin. (T. 474)

On November 19, 2012, Plaintiff saw Dr. Williams, where he noted Plaintiff tolerated medications well.  He diagnosed her with hypertension, GERD, post-menopausal, PTSD, osteoporosis, and ankle and hip problems. (T. 472)

A review of Plaintiff's progress at WACG showed Plaintiff internalized a great deal of anger related to her ex-husband and her car accident.  As of January 21, 2013, Plaintiff continued to process and evaluate what she wanted to be part of her life.  She had demonstrated better ways to deal with her frustration when she became angry. (T. 494) Plaintiff's anxiety stemmed from a traumatic car accident and a past abusive relationship with her husband. (T. 495) Throughout her treatment Plaintiff's greatest stressors were the behavior of her children and not knowing what to

do with her life with her new limitations. The notes indicated she had a "career in which she was physically active, but is limited physically by what she can do and wonders what she should do now." (T. 495)

On January 22, 2013, Plaintiff had a treatment plan review at WACG for her anxiety disorder, insomnia, significant weight gain, change in appetite, overweight, chronic pain problems, seasonal allergies, high blood pressure, high cholesterol, reflux, nausea/vomiting, diarrhea/constipation, depression, chronic irritability, anxiety or panic, pain in joints, fractures, economic problems, occupational problems, and other psychosocial and environmental problems. (T. 491) Plaintiff wanted individual counseling and medication management to address her anger management problems, anxiety and divorce adjustment. (T. 491)

On April 22, 2013, Dr. Williams completed a physical RFC.  He opined Plaintiff could lift and carry on an occasional basis (no more than 1/3 of an 8-hour day) ten pounds; maximum ability to lift and carry on a frequent basis (1/3 to 2/3 of an 8-hour day) less than ten pounds; and she could only sit, stand and walk less than two hours during a normal 8- hour workday, and Plaintiff would require more than the normal break-time throughout the workday. (T. 515) Plaintiff could occasionally twist, but never stoop, crouch, kneel, crawl, or climb stairs or ladders. (T. 516) Plaintiff's physical functions affected by her impairment included: reaching, handling, pushing and pulling frequently, and fingering and feeling occasionally. (T. 516) Plaintiff should avoid all exposure to extreme heat, cold, wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards, and concentrated exposure to noise. (T. 516) Diagnoses and medical findings to support the limitations were previous fusion surgery, osteoarthritis and others. (T. 516) Dr. Williams observed redness, swelling, muscle spasms and joint deformity.  He opined Plaintiff's pain was moderate, however she could tolerate the pain, but it would cause marked handicap in the

14

performance of the activity precipitating the pain. (T. 517) Dr. Williams opined Plaintiff could work in a low stress environment, Plaintiff ambulated with a cane, and would need to elevate her leg approximately 18 to 19 inches in a work setting. (T. 517) In Dr. William's opinion, Plaintiff could not do a full time competitive job that required activity on a sustained basis, and she would be absent from work approximately once a month. (T. 518)

On August 21, 2013, Dr. Kevin Price completed a Mental Impairment Evaluation form and found Plaintiff to have generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, vigilance, and scanning.  (T. 10) He further found Plaintiff had a persistent irrational fear of a specific object, activity, or situation which resulted in a compelling desire to avoid the dreaded object, activity or situation. Plaintiff had recurrent severe panic attacks, manifested by sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Plaintiff also had recurrent obsession or compulsions and intrusive recollections, and these were sources of marked distress. (T. 11) Dr. Price opined Plaintiff had a poor ability to follow work rules, interact appropriately with co-workers and supervisors, deal with the public, deal with work stresses, function independently, and maintain attention or concentration. (T. 13) Furthermore, Dr. Price opined Plaintiff would have poor ability to adjust to a job's mental requirements to understand, remember and carry out complex, detailed, and simple job instructions. (T. 14) Plaintiff would also have a poor ability to maintain personal appearance, behave in an emotionally stable manner, react predictably and appropriately in social situations, and demonstrate reliability in work practices, including attendance. (T. 14) Dr. Price opined Plaintiff would not be able to work an 8-hour day on a regular basis and her impairments were expected to last at least twelve months. (T. 14)

The state agency opinion evidence is as follows.

On February 11, 2012, Dr. Jeremy Kokkonen, state agency medical consultant, performed a physical examination on the Plaintiff. Dr. Kokkonen observed Plaintiff was a well-developed, overweight female, who was dressed appropriately, right hand dominate and ambulated with a cane. (T. 304) Plaintiff walked with an antalgic gait with the use of a single tipped cane with excessive knee extension and heel strike on the right.  She was able to rise from a sitting position without assistance, stand on tiptoes, heels, bend and squat without problems, however she had problems with her tandem walk. Plaintiff exhibited a 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects bilaterally. (T. 304) Plaintiff's range of motion for her right ankle was normal for dorsiflexion and planter flexion, however her internal rotation was 0-15 and external rotation was 0-10.  Plaintiff's right wrist range of motion was normal except her dorsiflexion was 0-35. (T. 306-307) The X-ray of Plaintiff right wrist revealed an old healed scaphoid fracture and her right ankle showed calcifications along an old healed calcaneal fracture. (T. 304) Dr. Kokkonen diagnosed Plaintiff with right heel pain secondary to orthopedic injury (restricted eversion/inversion) and right hand pain secondary to orthopedic injury (restricted extension). Based upon his examination and the objective evidence, Dr. Kokkonen opined Plaintiff was able to sit for a full workday, walk and/or stand with limitations, lift/carry with limitations only if requiring right wrist extension, hold a conversation, respond appropriately to questions, carry out and remember instructions. (T. 305)

Dr. Jonathan Norcross, state agency medical consultant, performed a physical RFC assessment on February 28, 2012, and determined Plaintiff could occasionally lift ten pounds, frequently lift/carry less than ten pounds, stand and/or walk for a total of at least two hours in an 8-hour workday, sit for a total of about six hours in an 8-hour workday, Plaintiff was limited in her upper

extremities in the area of pushing and pulling. (T. 310) Plaintiff could occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch, and crawl. (T. 311) Dr. Norcross opined Plaintiff could perform sedentary work with limited use of levers in the right upper extremity and postural limits. (T. 316) Dr. Jim Takach, state agency medical consultant, reviewed the medical evidence of record and affirmed Dr. Norcross's assessment on May 28, 2012. (T. 411)

## IV.   Discussion:

Plaintiff raises two issues on appeal: (1) the ALJ's Decision was not supported by substantial evidence, as the objective evidence showed Plaintiff continued to meet listing (1.02); and, (2) The ALJ erred in taking the state agency's medical examiners opinions over the Plaintiff's treating physician and psychiatrist.  The undersigned has reviewed the entire record and finds the ALJ's Decision is not supported by substantial evidence.

### A. Medical Improvement:

The ALJ rendered a partially favorable decision granting Plaintiff benefits from April 11, 2011 until April 24, 2013. On April 25, 2013, the ALJ determined Plaintiff had a medical improvement and was no longer disabled.  When benefits have been denied based on a determination that a plaintiff's disability has ceased, the issue is whether the plaintiff's medical impairments have improved to the point where she is able to perform substantial gainful activity. *See* 42 U.S.C. § 423(f)(1). The "medical improvement" standard requires the Commissioner to compare a Plaintiff's current condition with the condition existing at the time the plaintiff was found disabled and awarded benefits. The continuing disability review process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f). *See Dixon v. Barnhart*, 324 F.3d 997, 1000-1001 (8th Cir. 2003).

The regulations provide that determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine the following: (1) whether the plaintiff is currently engaging in substantial gainful activity; (2) if not, whether the disability continues because the plaintiff's impairments meet or equal the severity of a listed impairment; (3) whether there has been a medical improvement; (4) if there has been a medical improvement, whether it is related to the plaintiff's ability to work; (5) if there has been no medical improvement, or if the medical improvement is not related to the plaintiff's ability to work, whether any exception to medical improvement applies; (6) if there is medical improvement, and it is shown to be related to the plaintiff's ability to work, whether all of the plaintiff's current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the plaintiff has the residual functional capacity to perform any of her past relevant work activity; and, (8) if the plaintiff is unable to do work performed in the past, whether the plaintiff can perform other work.  *See id.* (citing 20 C.F.R. § 404.1594(f)).  This eight-step sequential analysis for cessation of benefits includes the five steps to be followed in an initial disability determination. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993).

At step three of the eight-step analysis (i.e., whether there has been medical improvement), the ALJ determined that despite the fact Plaintiff continued to have arthritis, her function had improved and she was able to stand and sit for longer periods of time. (T. 29) He also noted that Plaintiff's GAF score improved to a 65, which reflected only mild limitations of mental function. Based upon the ALJ's observation of the Plaintiff at the hearing, where she had no overt signs of chronic pain, and recent medical records, the ALJ determined Plaintiff medically improved and

her disability ended the day after the hearing, April 25, 2013. (T. 29) The ALJ's determination of Plaintiff's medical improvement concerns the Court.

The date the ALJ chose to terminate Plaintiff's disability appears arbitrary and is unsupported by substantial evidence. No objective medical evidence of record established medical improvement such that Plaintiff's disability ended on April 25, 2012. To the contrary, the RFC assessments of Plaintiff's treating physician, Dr. Williams, and her treating psychiatrist, Dr. Price, indicated that Plaintiff was still unable to perform even at a sedentary level. In order for the ALJ to have made the determination Plaintiff had medically improved, he would have had to discredit Plaintiff's entire testimony the day prior and the RFC assessments of Dr. Williams and Dr. Price. It appears to the Court that the ALJ made his own "medical improvement" determination after seeing the Plaintiff at the hearing; that she ambulated with a cane and, after approximately thirty minutes of observing her during the hearing, he determined that she had medically improved. *See Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990)(an "ALJ must not substitute his opinion for those of the physician"); *Rheinhart v. Secretary of HHS*, 733 F.2d 571, 573 (8th Cir. 1984)(quoting *Ballowe v. Harris*, 650 F.2d 130, 133 n. 2 (8th Cir. 1981); *see Baugus v. Secretary of Health and Human Services,* 717 F.2d 443, 448 (8th Cir. 1983); and, *O'Leary v. Schweiker,* 710 F.2d 1334, 1342 (8th Cir. 1983)(the ALJ is not free to reject the claimant's complaints of pain solely on the basis of the personal observations made of the claimant during the hearing.).

Further, the ALJ relied too heavily on the notation in the medical record that Plaintiff was "feeling well," because "doing well" for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity. (T. 32) See, e.g., *Gude v. Sullivant*, 956 F.2d 791, 794 (8th Cir. 1992); and, *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir. 1991). The undersigned finds substantial evidence did not exist to support the ALJ's

finding of medical improvement, thus remand is necessary in order to allow the ALJ to evaluate Plaintiff's medical improvement in accordance with applicable rulings, regulations and Eighth Circuit case law.

**B.** *Polaski* **Analysis:**

Among the ALJ's findings in his Decision was a finding that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. (T. 33) Upon reviewing the entire record, the Court finds that the ALJ did not conduct a proper *Polaski* analysis by examining and addressing the relevant medical evidence, application documents, and testimony at the hearing in accordance with applicable regulations, rulings, and Eighth Circuit case law.

It is the ALJ's duty to determine the Plaintiff's RFC.  Before doing so, the ALJ must determine the Plaintiff's credibility, and how the Plaintiff's subjective complaints play a role in assessing her RFC. *Pearsall v. Massanari,* 274 F.3d at 1217-18. The ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and, (5) functional restrictions. The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski v. Heckler*, 739 F.2d 1230, 1322 (8th Cir. 1984).

To conduct the proper *Polaski* analysis, "[m]erely quoting *Polaski* is not good enough, especially when an ALJ rejects a claimant's subjective complaints of pain." *Hall v. Chater*, 62

20

F.3d 220, 223 (8th Cir. 1995). Instead, "*Polaski* requires that an ALJ give full consideration to all of the evidence presented relating to subjective complaints." *Ramey v. Shalala*, 26 F.3d 58, 59 (8th Cir. 1994). To that end, "[w]hen making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater*, 87 F.3d 992, 995 (8th Cir. 1996) (citing *Hall*, 62 F.3d at 223). Such a finding is required to demonstrate the ALJ considered and evaluated all of the relevant evidence. *See Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995) (citing *Ricketts v. Secretary of Health and Human Servs.*, 902 F.2d 661, 664 (8th Cir. 1990)). However, if "the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion," but "acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain .... [a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (citing *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987)).

During the closed period of disability, the ALJ found Plaintiff's subjective allegations were supported by the record and found to be entirely credible; however, after the closed period, he found Plaintiff was not credible without giving an explanation as to why. (T. 27, 33) On the day of the hearing, Plaintiff complained about limited movement of her right wrist (where she was unable to flex or rotate and she had a constant right tremor). Her right wrist affected her ability to grasp, she had limited sensation when she tried to lift objects, and she could not lift more than ten pounds or she would drop the item. (T. 47, 56) Plaintiff testified she continued to have chronic pain in her leg and ankle, the doctor discussed possible ankle replacement in the future, and she had lost one and one-half inches on her right side. (T. 49-50) Plaintiff also took arthritic

medications, but they only helped to an extent. Due to the nature of her injury, history of medication and medication allergies, Plaintiff did not take narcotic medication. (T. 50) Moreover, Plaintiff continued to elevate her leg during the day, in order to keep the swelling down and help alleviate the throbbing, which was consistent with Dr. Williams's RFC assessment. (T. 52) Plaintiff further testified she could not sit in the same place for very long and spent four to five hours per day resting or laying down. (T. 57) It appears to the undersigned, after reviewing the record, Plaintiff's testimony the day before the closed period ended was consistent with the objective medical evidence and Dr. Williams's RFC.

In sum, the ALJ failed to acknowledge and consider several of the *Polaski* factors before discounting Plaintiff's subjective complaints of pain after the closed period of disability. If the ALJ is going to discount the Plaintiff's subjective complaints of pain, then the ALJ must make an express credibility finding and give his reasons for discrediting the testimony. The ALJ did not do so in this case, and remand is necessary for the ALJ to conduct a proper *Polaski* analysis.

### C.  ALJ's RFC assessment:

While Plaintiff does not raise the issue regarding the ALJ's RFC assessment, the Court finds substantial evidence does not support the ALJ's RFC assessment after the closed period of disability.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible

22

for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004.)

In assessing the Plaintiff's RFC during the closed period, the ALJ considered the Plaintiff's testimony at the hearing, disability reports, treating physician's records, and the consultative medical examinations. (T. 27-30) The ALJ gave Dr. Williams's RFC great weight, however the day after the hearing, the ALJ determined,  Dr. Williams's RFC was no longer controlling, and the ALJ gave controlling weight to consultative medical examiners. (T. 33) The ALJ did not explain his reasoning as to why Dr. Williams's RFC was no longer controlling, but rather, he stated the "claimant appears to be improving, both mentally and physically, to the degree that she is able to perform sedentary, skilled jobs, which is consistent with Dr. Kokkonen's RFC." (T. 29) This causes the Court great concern as Dr. Kokkonen's RFC was performed in February of 2012; three months later Plaintiff had a fusion surgery on her ankle; and, Dr. Williams's RFC was performed in April of 2013, over a year after Dr. Kokkonen's.

Dr. Williams had been treating the Plaintiff since March of 2012 and continued to treat her.  In his RFC assessment, Dr. Williams's opined Plaintiff would have to take longer than normal breaks, be absent from work once a month, she could only sit, stand, and walk less than two hours during a normal eight hour work day, needed to elevate her leg 18 to 19 inches during the work day, and she could not do a full time competitive job that required activity on a sustained basis. (T. 515-518) None of these limitations were in the Plaintiff's RFC as determined by the ALJ, nor were they were not given as hypotheticals to the vocational expert. While the ALJ did not expressly state controlling weight was given to the state agency medical consultants, he did state the medical consultants "are medical judgments and expert opinions supportive of my finding that the claimant is not disabled." (T. 33) In order to come to the conclusion that Plaintiff was not disabled as of April 25, 2013, the ALJ disregarded Dr. Williams's RFC, Dr. Olive's ankle fusion, and Plaintiff's subjective complaints of pain. The ALJ further disregarded another treating physician's assessment, Dr. McCleod, of Plaintiff's permanent whole-body impairment when he only cited to a permanent loss of 12% regarding her ankle, and failed to mention the other 12% loss of whole body regarding her wrist. (T. 282, 283) It seems evident from the ALJ's decision that he cherry-picked what fit his RFC to find the Plaintiff not disabled after the hearing.

The ALJ mentioned in his Decision Plaintiff's subtalar fusion in May 2012, and that she had good healing and moderate arthritis. (T. 28) However, the ALJ failed to mention, at the same appointment, which was five months post subtalar fusion, Plaintiff had intermittent popping, moderate swelling in the foot, and decreased sensation in the medial arch. (T. 450) In order for the ALJ to have made an informed decision regarding Plaintiff's limitations and restrictions he should have ordered Dr. Olive to complete an RFC, instead of relying on Dr. Kokkonen's physical examination conducted in 2011. See *Gasaway v. Apfel*, 187 F.3d 840, 842 (8th Cir. 1999);

*Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." (citation and internal quotes omitted)). The undersigned finds substantial evidence did not support the ALJ's RFC determination.  In order to make a more informed decision regarding Plaintiff's RFC, on remand the ALJ is directed to obtain a physical RFC, preferably from Dr. Olive, or another orthopedic surgeon, detailing Plaintiff's limitations and restrictions regarding her wrist and ankle.

Although the ALJ did not have the benefit of Dr. Price's mental examination, it was submitted to the Appeals Council for review, and it imposed significant non-exertional restrictions. Dr. Price had been treating the Plaintiff since August of 2012, and he had a good understanding of Plaintiff's mental limitations.  Dr. Price opined Plaintiff would have a poor ability to adjust to a job's mental requirements to understand, remember and carry out complex, detailed, and simple job instructions. (T. 14) Plaintiff would also have a poor ability to maintain personal appearance, behave in an emotionally stable manner, react predictably and appropriately in social situations, and demonstrate reliability in work practices, including attendance. (T. 14) Dr. Price was of the opinion Plaintiff would not be able to work an 8-hour day on a regular basis and her impairments were expected to last twelve months.  Dr. Price's findings are consistent with Plaintiff's testimony regarding her mental limitations: she tried to have someone in the car at all times because of panic attacks, she was unable to drive at night time, and had recurrent nightmares of the car accident. (T. 52, 55) On remand, the ALJ is to consider Dr. Price's mental RFC and its limitations in determining Plaintiff's RFC.

## V.   <u>Conclusion:</u>

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

Dated this 1st day of June, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE